# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## SOUTHEASTERN DIVISION

WILLIE BEATRICE WASHINGTON,   )
individually and as Personal   )
Representative of the Estate of   )
Frank George Washington,   )
   )
      Plaintiff,   )
   )
  vs.   )
   )   Case number 1:04cv0007 TCM
UNITED STATES OF AMERICA   )
and DEPARTMENT OF VETERANS'   )
AFFAIRS,   )
   )
      Defendants.   )

## FINDINGS OF FACT AND
## CONCLUSIONS OF LAW

This medical malpractice action is before the Court[1] on allegations by Willie Beatrice Washington, individually and as the personal representative of the Estate of Frank George Washington ("Plaintiff"), that Mr. Washington received improper medical when he was a patient at two Veterans' Affair Medical Centers ("VA"), resulting in the amputation of his left leg below the knee and his death.

Plaintiff's claims, filed under the Federal Tort Claims Act, 28 U.S.C. §§ 2671-80 ("FTCA"), were tried before the Court on June 6 and 7, 2005. The following witnesses testified at the bench trial: Plaintiff; Charles Kilo, M.D., an endocrinologist; Clay Franklin, the VA Chief of Pharmacy; Brenda Welsh, L.P.N.; Christy Maurer, R.N.; Catherine Hetton,

---

[1]The case is before the undersigned United States Magistrate Judge by written consent of the parties. See 28 U.S.C. § 636(c).

R.N.; Sheikh Sadiq, M.D.; David R. Campbell, M.D., a vascular surgeon; and Barry L. Molk, M.D., a cardiologist. Admitted into evidence were the parties' Joint Stipulation of Uncontested Facts, Defendants' Exhibit P and its attachments, Defendants' Exhibits D and M, and Plaintiff's Exhibit 33 and its attachments.

The following is the Court's findings of fact and conclusions of law. See Fed.R.Civ.P. 52.

## **Findings of Fact**

1. Plaintiff is a Missouri resident, the widow of Frank George Washington, and the personal representative of his Estate. (Stip. ¶ 1.[2]) She and Mr. Washington were married in October 1970, divorced in April 1980, and remarried six months later, on October 29. (Gov. Ex. M.) They remained married until Mr. Washington's death. (Id.) They had no children. He and Plaintiff lived in Portageville, Missouri; he cut the grass, took care of the family cars, and was active in his church.

Mr. Washington was born on December 12, 1940, and died on August 23, 2002. (Id.; Stip. 1.) He was 61 years of age at the time of his death. (Gov. Ex. M.)

Mr. Washington worked for the New Madrid County Highway Department from 1980 until April 15, 2002, when he retired early due to his health. Plaintiff was a homemaker since 1992, and had previously been a factory worker.

Mr. Washington was an insulin dependent diabetic – he injected himself with insulin twice a day – and had a history of heart problems. After his retirement, Mr. Washington

---

[2]"Stip." refers to the Joint Stipulation of Uncontested Facts prepared by the parties.

began receiving medical treatment from the VA in Poplar Bluff, Missouri. He was a veteran of the United States Army.

2. On Saturday, May 25, 2002, Mr. Washington stepped on a nail, causing a puncture wound to his left foot. Plaintiff returned home from visiting her mother and observed Mr. Washington walking with a limp. Plaintiff looked at his foot and observed a slight red mark on the bottom of his foot; the mark appeared to be a puncture wound. The wound was not draining and did not appear to be very serious. Mr. Washington was wearing white socks and house slippers after the injury. There was no blood on the white socks. Plaintiff suggested that her husband go to the emergency room because of the danger a foot injury presented to Mr. Washington with his diabetes. Mr. Washington informed Plaintiff that he already had an appointment at the VA on May 29. He continued to drive a car and work around the house until his May 29 doctor appointment. He used a cane after the injury to his foot. Plaintiff looked at Mr. Washington's foot each day and noticed some swelling, but the wound did not look infected. Mr. Washington did not use any antibacterial salve on the injury because he and Plaintiff believed that this was not the proper treatment for a puncture wound.

3. On May 29, 2002, Plaintiff and Mr. Washington drove to the Poplar Bluff VA. Because they were not familiar with the facility, they parked their car some distance from the doctor's offices. Mr. Washington walked with a cane to the facility. A VA employee offered him the use of a wheelchair after seeing him walk with a limp. Mr. Washington went to the primary care clinic and met with an intake nurse who obtained a medical history of Mr. Washington, including the puncture wound to his left foot. (Pl. Ex. 33 at P7-P9.)

According to the nurse's note, Mr. Washington was in no pain and was ambulatory. (Id. at P7.)

4. Mr. Washington was then seen by Dr. Sheikh Sadiq. Dr. Sadiq is a citizen and resident of the State of Missouri and was, at all times relevant, a duly licensed physician and surgeon practicing medicine within the State of Missouri. (Stip. ¶ 2.) He was also, at all times relevant, acting as the servant, employee, and agent of the United States and the Department of Veterans' Affairs ("the Department"). (Id. ¶ 3.) Dr. Sadiq has been a staff physician for the VA in Poplar Bluff since April 1997. (Id. ¶ 12.) Dr. Sadiq is a board-certified neurologist, but no longer specializes in neurology. He began practicing general medicine in the late 1980's and early 1990's.

The Department is an agency of the federal government, and the United States is the proper defendant. (Id. ¶ 4.) Plaintiff has properly exhausted her mandatory administrative remedies by filing a claim with the Department. (Id. ¶ 5.)

5. Dr. Sadiq physically examined Mr. Washington's foot by touching it, pressing around the wound, checking for a pulse on the foot, and making observations. Mr. Washington told him on May 29 that he suffered from diabetes mellitus. (Id. ¶ 11.) Dr. Sadiq's records reflect that Mr. Washington was to: (1) be seen again in two months; (2) receive blood test work and a tetanus shot on the way out of the VA offices; (3) call or return to the VA if there were no improvements or if the wound became worse; (4) receive a chest x-ray and an EKG on a return visit; and (5) return for a nursing appointment in "1-2 weeks for follow up of abscess left foot." (Def. Ex. P at P5-P6; Pl. Ex. 33 at P5.) The doctor's

report also states that Mr. Washington "'stepped on nail. Abscess forming in sole. R/O Osteo."[3] (Pl. Ex. 33 at P5.) Dr. Sadiq's narrative of the examination reads, in relevant part:

> [Mr. Washington] . . . gives a history of congestive heart failure with fluid around the heart and lungs. . . .
>
> [Mr. Washington] stepped on a nail a few days ago and has been having pain and swelling. Examination shows an abscess in the left sole in between the second and third metatarsal. I shall put him on Augmentin and have him come back in one to two weeks for follow up in the nursing clinic. I shall also obtain x-rays. I shall get a chest x-ray and will ask for an echocardiogram later on to evaluate his history of congestive heart failure.

(Id. at P10.) Dr. Sadiq also observed on examination that Mr. Washington was walking with some difficulty because of the pain in his left leg. (Id.)

Dr. Sadiq testified at trial that his notation that the examination showed an abscess was incorrect, and that the correct notation should have read that an abscess was forming. He testified in his January 2005 deposition that on May 29, 2002, he observed "some whitish material underneath and I thought that infection was setting in." (Sadiq Dep. at 17.) The whitish material was puss. (Id. at 18.) He further testified in his deposition that he "thought at the time, yes, it is and I think it was an abscess in formation at least." (Id. at 19.)

6. Dr. Sadiq prescribed Augmentin, an antibiotic, to Mr. Washington on May 29 along with other medications and intended that Mr. Washington pick up the prescriptions at the VA pharmacy on that date. (Def. Ex. G.) A prescription for aspirin was issued that same date, but the aspirin was to be mailed to Mr. Washington. (Id.) Prescriptions are ordered electronically by the doctor at the VA. The patient does not receive a traditional handwritten

---

[3]"R/O osteo" is short-hand for rule out osteomyelitis. (Sadiq Dep. at 22.) Osteomyelitis is an inflammation of a bone in the foot and may result from infections associated with diabetes. Id.; Stedman's Med. Dictionary, 1269 (26th ed. 1995); Merck Manual, 413 (16th ed. 1992).

prescription, except in unusual cases not applicable here. To receive a prescribed medication after a doctor's visit, the patient presents himself or herself at the pharmacy located in the VA.

7.     After his examination by Dr. Sadiq, Mr. Washington presented himself to a nurse, Julie Ray, for an exit interview and for follow-up instructions. (Pl. Ex. 33 at P3-4.) Her notes of that interview include the following: "Sent to pharmacy for medication and instructions: N/A.[4] . . . Special instructions: . . . [Patient] to receive tetanus inj[ection] before departure. . . . Patient did not have any medicines prescribed at this visit. Patient did not have any new prescriptions at this visit." (Id. at P3.)

Plaintiff testified that the nurse advised her and Mr. Washington that the prescriptions would be mailed to Mr. Washington. She further testified that she and Mr. Washington did not go to the pharmacy. Mr. Washington received his tetanus shot, as directed. Plaintiff and Mr. Washington believed that he had a followup appointment two days later, on May 31, for a bone scan. VA records do not reflect this appointment. Mr. Washington was never directed by Dr. Sadiq or anyone at the VA to stay off his left foot or to keep his left foot elevated.

8.     Clay Franklin is the Chief of Pharmacy at the VA in Poplar Bluff. His records reflect that Mr. Washington did go to the pharmacy on May 29 and was "counseled" on the medications prescribed. (Def. Ex. P at P2.) The pharmacy is on the ground floor of the VA Medical Center. There are signs in the facility that provide directions to the pharmacy. The

---

[4]Dr. Sadiq would not agree that the acronym "N/A" stands for "not applicable." Counsel for the Government stipulated that "N/A" means not applicable, and the Court takes notice of that fact.

pharmacy is not similar to a traditional drugstore. There is no area for the patient to shop or view consumer items. The pharmacy consists of a window where the patient meets with a pharmacist, provides the appropriate identification, discusses the prescription, if necessary, and eventually receives the medications. In the instant case, Dr. Sadiq ordered that Mr. Washington's prescription be picked up at the window by the patient, with the exception of the aspirin which was to be mailed. Mr. Washington was not given a paper prescription. Although the pharmacy records reflect that Mr. Washington received the counseling for the prescribed drugs, the records also reveal that Mr. Washington did not pick up the drugs after the counseling. It normally takes 15 to 60 minutes to fill a prescription once a patient appears at the pharmacy window. Typically, a number of VA outpatients who are to pick up their prescriptions on the day of their examination fail to do so. A list of those outpatients failing to retrieve their drugs is prepared regularly; their prescriptions are mailed to them after several days. (Def. Ex. F.) Mr. Washington's name appeared on the May 31 list of those who failed to pick up ordered prescriptions, and his name was scratched out with "P-U," or picked up, written after his name. (Id.)

     9.     On May 31, Mr. Washington and Plaintiff returned to the VA where they retrieved the ordered prescriptions from the pharmacy window. (Def. Ex. F.) The pharmacist advised Mr. Washington that the medication was just about to be mailed to him. Mr. Washington's foot was worse and more swollen, according to Plaintiff's testimony. He still walked with a limp and used a wheelchair when he entered the VA building. Plaintiff testified that Mr. Washington met with Dr. Sadiq on May 31, but the medical records do not

confirm this. On the other hand, Dr. Sadiq testified that he did not examine Mr. Washington on May 31.

At the May 31 visit, an x-ray was taken of Mr. Washington's left foot to rule out osteomyelitis. (Def. Ex. P at P217.) No significant degenerative changes were found. (Id.)

10. Between May 31 and Sunday, June 2, Mr. Washington's foot worsened. It became darker in color, and he complained of more pain. On the morning of June 2, Plaintiff took Mr. Washington to the VA emergency room. He was then admitted to the hospital "with fever and uncontrolled diabetes." (Def. Ex. P at P149.) He had an abscess in his left foot. (Id.) The admission record included notations that Mr. Washington had been seen in the outpatient clinic the week before and then was showing "some abscess formation with cellulitis." (Id.) On examination after admission, his foot was swollen and there was a small amount of drainage from the abscess. (Id.) Mr. Washington did not respond to the Augmentin and was placed on intravenous, or IV, antibiotics. (Id.)

A physician's notes on June 2 indicate that Mr. Washington's left foot was "red, hot, [and] tender all over" with moderate swelling and a draining puncture wound. (Sadiq Dep. at 14.) The drainage was "[p]robably" puss. (Id. at 17.)

Dr. Sadiq did not see Mr. Washington on June 2, but did exam him on June 3. (Id. at 34.) His notes describe Mr. Washington's left foot as swollen with a small amount of drainage from the abscess. (Id.) A bone scan was taken of Mr. Washington's left foot. (Def. Ex. P at P216.) The scan indicated that there was a "[g]as forming infectious process involving the soft tissues" between the first and second metatarsophalangeal joints." (Id. at

P216.) Although no evidence of osteomyelitis was found, a more sensitive bone scan was suggested. (Id.)

11. Mr. Washington's diabetic history prior to May 29 and after his admission to the VA hospital indicates a lack of control of his blood sugar count. His ideal blood sugar count should have remained below 200. He was given a hemoglobin A1C blood test on May 31 at the VA. This test reveals a patient's average blood sugar count for a two to three month period. (Kilo Dep. at 31.) Mr. Washington's test result was 12.3, indicating an average blood sugar count of over 300 for the previous three months. His blood sugar count was regularly above 300, sometimes above 400, and almost always over 200 while in the VA hospital.[5]

It is difficult to control infections in a patient with a high blood sugar count. This difficulty is one of the major dangers to diabetic patients with puncture wounds to the foot. Such wounds are often deep, creating a danger of an infection well inside the tissue. When an infection does result, treatment becomes more difficult for diabetics in general and more so for diabetics with high blood sugar counts, like Mr. Washington. Thus, it is important to reduce the patient's blood sugar count when fighting an infection. Mr. Washington's blood

_____

[5]As reported by the VA hospital, Mr. Washington's blood sugar count was as follows:

| | | | |
|---|---|---|---|
| June 13 | 475, 520, 431 and 431 | July 13 | 276 |
| June 05 | 474 | July 14 | 274 |
| June 07 | 420 | July 21 | 261 |
| June 19 | 312 | July 25 | 293 |
| June 20 | 320 | August 06 | 279 and 382 |
| June 22 | 383 | August 20 | 243 |
| June 29 | 279 | August 22 | 205 |
| July 02 | 315 | August 23 | 184 |
| July 04 | 360 | | |

sugar count was never under control while in the VA hospital, until near the time of his death. This was a contributing factor in the VA's inability to treat the infection in Mr. Washington's left foot and leg. Dr. David Campbell testified that on May 31, Mr. Washington's blood sugar count was 467. While in the VA hospital, Mr. Washington's blood sugar count was uncontrolled by the medical staff. In a controlled environment such as a hospital, with the various insulins available in 2002, a diabetic patient's blood sugar count can be controlled adequately depending upon the care the patient received. (Kilo Dep. at 54, 55.) Oral antibiotics are less effective than intravenous antibiotics, especially in situations, as in Mr. Washington's case, where there is evidence of adequate flow of blood to the foot.

Additionally, hypoglycemia may occur in a patient with a high blood sugar count, making the management of the high count more difficult. There is evidence that Mr. Washington became hypoglycemic several times while at the hospital after June 2, 2002. Hypoglycemia results when a patient receives too much insulin.

12. An abscess is a stage of an infection with signs of inflammation, formation of puss, and some pressure to the wound. When there is an infected puncture wound to a foot or when there is an abscess in a diabetic patient, the patient should be directed immediately to remain off of his foot and to elevate the foot. These instructions are essential because placing weight on the infected foot causes the infection or abscess to spread throughout the sole of foot. (Kilo Dep. at 30.) When a diabetic patient presents with an abscessed puncture wound to his foot, he should not be sent home, he should be given an intravenous antibiotic, and he should be instructed to keep weight off his foot and keep it elevated. (Id. at 30, 53.)

13.    On June 4, the dead skin on Mr. Washington's foot was debrided, or excised, and the wound was incised and drained.  On June 13, because of the lack of control of the infection, Mr. Washington was transferred to the Veterans Medical Center in St. Louis, Missouri.  The next day, he underwent a transmetatarsal amputation.  Gangrene persisted, however, and on June 18, Mr. Washington underwent a below-the-knee amputation.  The gangrene and infection in the foot demonstrated a lack of control of the infection and a lack of control of Mr. Washington's blood sugar count.

On June 20, Mr. Washington was returned to the VA hospital in Poplar Bluff.

14.    Mr. Washington suffered from a weak heart evidenced by a weak ejection fraction.  When the heart relaxes, it fills with blood to near 100 percent capacity.  When the heart pumps or squeezes, the blood is pumped around the body.  The percentage of blood released from the heart with each pump or squeeze of the blood is the ejection fraction.  A normal ejection fraction is 55 to 75 percent.  In 2002, a weak ejection fraction could not be repaired.[6]  The best hope for a patient with a weak ejection fraction was to attempt to maintain that number without a decrease.  Patients with an ejection fraction of under 35 percent usually died of arrhythmia in a sudden death.  Mr. Washington's ejection fraction was 26 percent.

Mr. Washington also had coronary artery disease, with two of his three coronary arteries severely blocked 90 to 95 percent.  Additionally, Mr. Washington had a leaking mitral value in his heart.

---

[6]The medical profession now uses intracardiac defibrillators to treat this condition, but that treatment was not used in 2002.

Mr. Washington survived the two amputations well. The surgeries had no effect on his death. The infection in his left foot and leg precluded aggressive heart treatment such as cardiocatheterization, the use of a stint, or angioplasties. There is, however, no evidence that a stint or angioplasties or bypass was possible because no diagnostic tests were performed due to the infection in Mr. Washington's foot.

15. While Mr. Washington was in the VA hospital in Poplar Bluff, Plaintiff visited him three to four times each week until his death. While Mr. Washington was in the VA Medical Center in St. Louis, Plaintiff visited him once. She testified that she was uncomfortable driving in a large city. Plaintiff was not present when the medical team was assessing Mr. Washington's release plan and goals on July 30. At that meeting, Mr. Washington advised nurse Catherine Helton that he was going to divorce his wife when he was released from the VA, and that Plaintiff had left home to live in Elgin, Illinois – a town near Chicago. (Def. Ex. P at P97.) Mr. Washington also expressed his plans to move into an assisted living apartment and become active in the local church. (Id.) The nurse's note reflects that Mr. Washington was "very verbal and positive about his plans." (Id.) There is also evidence from some of the nurses who treated Mr. Washington in the VA hospital after June 2 that he was upset that his wife wanted a divorce and that he did not want Plaintiff to have a chair that his friends from the church had given him while he was in the hospital.

Plaintiff denies that she ever went to Elgin, Illinois, while her husband was in the hospital and testified that they had a "good marriage."

Mr. Washington died on August 23, 2002, at 10:33 p.m. (Gov. Ex. M.) Nurse Brenda Welsh heard a scream from Mr. Washington's room, and, when she arrived there, he was dead. The medical team attempted to revive Mr. Washington, but to no avail.

16. Nurse Christy Maurer contacted Plaintiff to tell her that Mr. Washington had died. Plaintiff informed Ms. Maurer that she wanted to view his body. Plaintiff arrived at the hospital at approximately 1:45 a.m. and remained with her husband until 2:20 a.m. (Def. Ex. B at P6.) Plaintiff was very emotional at the hospital upon viewing Mr. Washington's body and wanted to talk with whoever spoke with him last. (Id.)

17. Dr. Sadiq and the medical staff at the VA hospital in Poplar Bluff were negligent in the following respects:

- Dr. Sadiq should have hospitalized Mr. Washington on May 29 after he observed an abscess around the puncture wound in Mr. Washington's left foot. In the alternative, he should have, at a minimum, ordered Mr. Washington to stay off his feet and to elevate his left foot when at home.

- Mr. Washington should have been given intravenous antibiotics immediately on May 29 because of the danger an infected puncture wound to the foot presents to a diabetic patient.

- When Dr. Sadiq and the VA learned of Mr. Washington's blood sugar count on May 31, including the hemoglobin A1C test with a 12.3 result, more care should have been taken to reduce Mr. Washington's blood sugar count and keep it under control. The blood sugar count was consistently high throughout

Mr. Washington's stay at the VA, thereby contributing to the lack of progress in controlling Mr. Washington's infection in his left foot.

- Mr. Washington was sent home on May 29 with conflicting instructions relating to his medication. There are conflicting notes and testimony from the VA medical team with respect to instructions provided to Mr. Washington on whether the medication was to be mailed to Mr. Washington or if he was to pick up the medication from the VA pharmacy. Consequently, Mr. Washington did not begin taking the antibiotic for his infection until May 31.

- There was confusion with the instructions from the VA on when Mr. Washington was to return to the medical facility for followup treatment. He returned on May 31, but Dr. Sadiq's records reflect that Mr. Washington was to have his blood work performed on May 29. This delay precluded the VA from knowing the extent to which Mr. Washington's blood sugar count was excessive.

- The puncture wound was not incised and drained until June 4 at the VA.

18. There is insufficient evidence that Mr. Washington died as a result of the treatment he received by Dr. Sadiq or anyone at the VA hospital. The major cause of Mr. Washington's death was the weak condition of his heart, as evidenced by the low ejection fraction of 25 percent. Individuals with damaged and weak hearts with a low ejection fraction, such as Mr. Washington's, did not normally live long based upon the treatment available in 2002. Mr. Washington was given diuretics, therapy, and ace inhibitors as

needed. Those patients with low ejection fractions normally die of arrhythmia, which was Mr. Washington's cause of death.

## Conclusions of Law

### A.    Jurisdiction

The FTCA waives the United States' sovereign immunity with certain limitations, not applicable in the instant case, and when certain jurisdictional prerequisites have been met. See 28 U.S.C. §§ 2674-75. One of those prerequisites is the presentment by the plaintiff of her claim to the appropriate Federal agency and the agency's denial of that claim. See 28 U.S.C. § 2675(a). This prerequisite has been satisfied; consequently, this Court has subject matter jurisdiction over this medical malpractice action against the United States pursuant to 28 U.S.C. § 1346(b)(1). Venue in the Eastern District of Missouri is proper pursuant to 28 U.S.C. § 1402(b) in that the acts and omissions complained of occurred in this District and also Plaintiff resides in this District.

### B.    Liability

Under the FTCA, "[t]he United States is liable to the same extent that a private person under like circumstances would be liable to the claimant in accordance with the law of the place where the act or omission occurred." **Washington v. Drug Enforcement Admin.**, 183 F.3d 868, 873 (8th Cir. 1999) (citing 28 U.S.C. § 1346(b)). "'The "law of the place" refers to the substantive law of the state where the wrongful conduct took place.'" **Id.** (quoting FDIC v. Meyer, 510 U.S. 471, 477-78 (1994)). Consequently, it is the law of Missouri that applies to Plaintiff's medical malpractice claims.

### C.    Standard of Care

### (i)    Medical negligence

"Under Missouri law, a plaintiff in a medical malpractice suit must prove that, by act or omission, the defendant failed to use that degree of skill and learning ordinarily used under the same or similar circumstances by members of his profession and that this negligent act or omission in fact caused the plaintiff's injury." **Sosna v. Binnington**, 321 F.3d 742, 744 (8th Cir. 2003). Accord **Meekins v. St. John's Reg'l Health Ctr., Inc.**, 149 S.W.3d 525, 532 (Mo.Ct.App. 2004); **Meyer v. Lockhard**, 118 S.W.3d 245, 250 (Mo.Ct.App. 2003). Moreover, "Missouri follows the 'but for' test of causation in medical negligence cases. Under this test, a physician is found to have caused a harm if the harm would not have occurred 'but for' the physician's negligence." **Tendai v. Missouri Bd. of Registration for the Healing Arts**, 161 S.W.3d 358, 370 (Mo. 2005) (en banc) (interim citation omitted). In medical negligence cases, the specific duty required of the defendant is defined by the profession, and an "expert witness is generally necessary to tell [the fact finder] what the defendant should or should not have done under the particular circumstances of the case and whether the doing of that act or the failure to do that act violated the standards of care of the profession." **Ostrander v. O'Banion**, 152 S.W.3d 333, 338 (Mo.Ct.App. 2005) (alteration added). Once the duty is established by expert testimony, whether a physician was negligent under the evidence presented becomes a question of fact for the fact finder. **Lashmet v. McQueary**, 954 S.W.2d 546, 551 (Mo.Ct.App. 1997).

### (ii)    Wrongful death actions

"In wrongful death actions, plaintiffs must establish that, but for defendant's actions or inactions, the patient would not have died." **Mueller v. Bauer**, 54 S.W.3d 652, 656 (Mo.Ct.App. 2001). And, "[i]f the death may have resulted from either of two causes, for one of which the defendant would be liable and for the other the defendant would not be liable, the plaintiff must show with reasonable certainty that the cause for which the defendant is liable produced the death." **Id.** (alteration added). If liability is found, damages may be awarded for death and loss of life along with funeral expenses, value of services, loss of consortium, companionship, comfort, instructions, guidance, counsel, training, and support. Mo.Rev.Stat. §§ 537.080, 537.090.

### (iii)    Lost chance of recovery[7]

In **Wollen v. DePaul Health Ctr.**, 828 S.W.2d 681 (Mo. 1992) (en banc), the Missouri Supreme Court recognized a cause of action for loss of chance of recovery in the case of a man who died of a gastric cancer.  Had the cancer been properly diagnosed and had the man received appropriate treatment, he would have had a 30% chance of survival.  The court found that his widow had a cause of action against the physician.  **Id.** at 684.  "[A] patient does suffer a harm when the doctor fails to diagnose or adequately treat a serious injury or disease.  The harm suffered is not, however, the loss of life or limb.  The harm is the loss of the chance of recovery."  **Id.** (alteration added).  See also **LaRose v. Washington Univ.**, 154 S.W.3d 365, 370 (Mo.Ct.App. 2005) (affirming award of damages to woman whose chance of recovery was reduced by physician's failure to timely diagnose her ovarian cancer); Mo.Rev.Stat. § 537.021.1(1) (providing for personal representative to be appointed to maintain, inter alia, cause of action for loss chance of recovery or survival).  To prevail on such a cause of action, the chance of recovery lost must be sizeable enough to be material.  **Wollen**, 828 S.W.2d at 685 n.3.  And, a plaintiff must satisfy the "but for" test applicable to medical malpractice cases.  **Callahan v. Cardinal Glennon Hosp.**, 863 S.W.2d 852, 862 (Mo. 1993) (en banc).

### D.    Comparative Fault

Missouri has adopted the doctrine of comparative fault, **Gustafson v. Benda**, 661 S.W.2d 11 (Mo. 1983) (en banc), and applies this doctrine to medical malpractice claims,

---

[7]Although neither Plaintiff nor Defendants argue or brief this issue, the Court notes that Plaintiff pled this cause of action in Counts IV, V, and VI.

**Wittmeyer v. Braby**, 706 S.W.2d 263, 264-65 (Mo.Ct.App. 1986).  In order to make a submissible claim of comparative fault, there must be evidence of a causal connection between plaintiff's alleged negligence and the resulting damages.  **Id.**

**Discussion**

**A.      The Amputation of Mr. Washington's Foot and Leg**

Mr. Washington stepped on a nail in his yard on May 25, 2002, yet waited four days to see a doctor.  He was a diabetic who had difficulty controlling his blood sugar and had suffered congestive heart failure in 2001.  When he saw Dr. Sadiq on May 29, his limp was severe enough that the employees at the VA noticed and provided him with a wheelchair.  He had walked into the VA with a cane.

Dr. Sadiq examined Mr. Washington's foot, knew he was a diabetic, and, in his first note, recorded that the examination showed "an abscess in the left sole" of the foot.  (Pl. Ex. 33 at P10.)  Dr. Sadiq testified in his deposition that the material in the vicinity of the puncture wound was puss.  (Sadiq Dep. at 18).

Confusion about the medication and Mr. Washington's next visit to see Dr. Sadiq begins here.  Dr. Sadiq prescribed medication to Mr. Washington, including some antibiotics for the infection in Mr. Washington's foot.  Plaintiff did not recall talking to Dr. Sadiq about the medicine but does recall talking with a nurse at the exit interview.  She believes that in that conversation Mr. Washington was told that the medicine would be mailed to him.  Mr. Washington did stop at the pharmacy and talked with a pharmacist about the medication that day but did not pick up the medicine.  The nurse's notes for the exit interview indicated that

Mr. Washington was not sent to the pharmacy for medicine, and that Mr. Washington was not prescribed new medicine at the May 29 visit. (Pl. Ex. 33 at P3.)

Additionally, there is confusion about the blood work Dr. Sadiq ordered on Mr. Washington. The blood work was not performed on May 29 but on May 31 when Plaintiff and Mr. Washington returned to the VA without an appointment. Mr. Washington's foot was more swollen on that second visit, but was not that much worse than on May 29. He again walked into the VA with a cane and was offered a wheelchair. Although Plaintiff testified that her husband did see the doctor that day, there is no evidence that Dr. Sadiq saw Mr. Washington. Mr. Washington was sent home after the blood test without having had a physical examination. He did pick up his medicine from the pharmacy that day. The medication was about to be mailed to him because he had failed to pick up the prescription on May 29. The failure of patients to retrieve their medicine from the pharmacy is a regular occurrence at the VA in Poplar Bluff. The Court finds that this is evidence of a system that fails to properly advise patients, specifically Mr. Washington, of the proper procedure to retrieve prescribed medication in a timely manner. This is also consistent with the confusion about Mr. Washington's next office visit and the failure to perform his blood work on May 29, as directed by Dr. Sadiq. According to Dr. Sadiq, Mr. Washington was not to see the doctor again for two months unless the foot became worse, and then Mr. Washington was to contact the VA immediately. Additionally, there is no evidence that Dr. Sadiq or the staff at the VA advised Mr. Washington to remain off of his left foot and to keep his foot elevated. The uncontroverted medical testimony reflects that this is a basic and important instruction that should be given under these medical circumstances.

The Court finds that Mr. Washington's treatment from his first visit to the VA was not aggressive enough considering that he was a diabetic with a puncture wound to his foot and that he was suffering from poor blood sugar control. The physicians who testified at trial on this subject all agree that puncture wounds are especially dangerous to diabetics, and especially dangerous when the puncture wound is to the foot of a diabetic. According to Dr. Kilo, Mr. Washington should have been hospitalized immediately because of the abscess in the foot so that his foot could be drained, his blood sugar could be better controlled, and he could be administered antibiotics through intravenous treatment. Dr. Kilo testified that this procedure would have ensured that Mr. Washington was off his foot, that he was receiving the proper medication for the infection, and that the medical profession would have more control over his blood sugar count.

By the time Mr. Washington returned to the VA on June 2, the abscess had grown, his foot was swollen and discolored, and he was in severe pain. Two days before, he had had a hemoglobin A1C test revealing that his average blood sugar count was over 300 for the past two or three months. Hospitalization should, therefore, have been ordered at least by that date, according to Dr. Kilo. On June 2, when Mr. Washington was finally hospitalized and placed on an intravenous antibiotic, the VA was unable to control his blood sugar count. The intravenous medication was ineffective in controlling the infection in Mr. Washington's foot. This resulted in two amputations, culminating in the loss of his left leg beneath his knee. Medical records present clear evidence that the VA was unable to properly control Mr. Washington's blood sugar until the time period near his death. This, according to Dr. Kilo, is the result of inadequate treatment. Dr. Kilo testified that intravenous insulin and the

testing of Mr. Washington's blood sugar count every one to two hours should have occurred in order to keep his blood sugar at a number below 120. The VA record indicates that Mr. Washington's blood sugar was consistently over 200 and often over 300 and 400.

The Court finds that Dr. Sadiq and the VA were negligent in failing to use the degree of skill and learning ordinarily used when a patient (a) is a diabetic with a puncture wound to the foot resulting in an abscess, and (b) has a known history of poor blood sugar control, this history including the results of a recent blood sugar test by the medical facility. The result of this negligent treatment was the loss of Mr. Washington's left foot and leg.

### B.     Wrongful death

Dr. Campbell testified that Mr. Washington's history of congestive heart failure in 2001, along with the ejection fraction of 25 percent, is a very serious medical condition. He testified that individuals with this combination of heart conditions rarely live over three years. Dr. Molk, board certified in internal medicine and cardiovascular disease, testified that Mr. Washington had a weak heart, a leaky mitral valve, and coronary artery disease in two of the three coronary arteries with blockage up to 95 percent. Mr. Washington's weak heart, according to Dr. Molk, is evidenced by a 26 percent ejection fraction. This condition is incurable, and, unlike today, the placement of a defibrillator was not the standard course of treatment for patients in Mr. Washington's condition in 2002. According to both these physicians, patients with a poor ejection fraction often die a sudden death and often die of arrhythmia. Mr. Washington's cause of death is listed on the death certificate as (a) severe arteriosclerotic heart disease with cardiac arrhythmia, (b) probable acute coronary block, (c) hypertension, and (d) diabetes. (Def. Ex. M.) According to these two physicians, there was

nothing the VA or Dr. Sadiq could have done to prevent Mr. Washington's death given the poor condition of his heart. The Court this finds testimony credible and finds that there is no breach in the standard of care that caused Mr. Washington's death.

### C.     Damages

Because of the negligence of Defendants, Mr. Washington had to endure two amputations culminating in the loss of his left leg below the knee. The first amputation was on June 14, the second was performed on June 18, 2002, and Mr. Washington died suddenly and without warning on August 23, 2002, without ever being released. He lived approximately two months with an amputated leg.

He believed that he would spend the remainder of his life (conceivably longer than two months) without his leg. According to the nurse's post-surgery notes, Mr. Washington was discussing the goals of his life after he was released from the hospital. These goals included moving to an assisted living apartment and becoming active in his church.

The Court finds that Mr. Washington suffered damages in the amount of Eighty Thousand Dollars ($80,000) for Defendants' negligence resulting in two amputations and the loss of his leg. Because of this negligence, Mr. Washington was subjected to two surgeries and the prospect of living with only a portion of one limb. The Court notes, however, that Plaintiff presented no loss of consortium claim arising from the medical malpractice relative to the two amputations.

The Court further finds that Mr. Washington and Plaintiff contributed to the infection that eventually led to the two amputations. Mr. Washington failed to go to an emergency room or otherwise seek medical attention on the day of the puncture wound. This would

have resulted in earlier treatment and a prescription for antibiotics to fight the possible infection. Mr. Washington and Plaintiff also have some responsibility for the confusion at the VA relating to the delay in receiving the medication and the delay in receiving the blood work. Considering the foregoing, the Court fixes the comparative fault of Mr. Washington at 10%.

Section 538.215.1 of the Missouri Revised Statutes requires the trier of fact in a medical malpractice action to itemize damages according to five categories: past economic damages; past noneconomic damages; future medical damages; future economic damages; and future noneconomic damages. The Court notes that Mr. Washington was retired at the relevant times and that his medical care was provided to him by the United States in return for his military service. Additionally, due to Mr. Washington's unfortunate death, there is no question of future damages. Consequently only one category applies – past noneconomic damages. These damages are defined as "pain, suffering, mental anguish, inconvenience, physical impairment, disfigurement, loss of capacity to enjoy life, and loss of consortium . . ." which "have accrued at the time the damages findings are made." Mo.Rev.Stat. § 538.205(7), (8).

For the foregoing reasons, the Court finds that Mr. Washington suffered past noneconomic damages in the amount of $80,000.00; that this sum is reduced by 10% for his comparative fault; and that his Estate is therefore entitled to total damages in the amount of $72,000.00. The Court notes that under the FTCA the United States is not subject to the payment of prejudgment interest on this amount. See 28 U.S.C. § 2674.

An appropriate Judgment shall accompany these Findings of Fact and Conclusions of Law.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 27th day of July, 2005.